ODOM, J.
 

 ' On December 28, 1928, the Shell Petroleum Corporation, the defendant, while engaged in seismographic operations in the parish of St. Landry, exploded a 600-pound charge of dynamite buried 23 feet beneath the surface of the ground, with 50 pounds on the surface ; the shot point being approximately 2% miles from plaintiff’s residence. The explosion caused earth tremors which plaintiff alleges were of such “terrific force as to shake his home after the manner of an earthquake, frightening the inmates, and damaging his home in the sum of nine thousand, four hundred and fifty-five dollars.’’ He itemizes the estimated cost of repairing the alleged damage as follows:
 

 1. Replastering -and lathing....... $3,100.00
 

 2. Damage tile and flat roofs and gutters ..................... 575.00
 

 3. Brick work damage to foundation and chimney, tiling, etc... 560.00
 

 4. Carpenter work and new inside finish and refinishing........ 2,100.00
 

 5. Removing material torn out____ 500.00
 

 6. Damage to shrubbery and foundation plants........... 800.00
 

 7. Estimated repairs to and refinishing floors, replacing in cases ....................... 700.00
 

 8. Other damage that will not show up until plastering is removed, and inconvenience and costs of moving out and back.......... 1,120.00
 

 $9,455.00
 

 Plaintiff brings this suit- to recover the ■loss caused by the alleged damage.
 

 The defendant in answer admitted that, it caused to be exploded the charge of dynamite in St. Landry parish as alleged, but especially denied that the explosion caused any damage to plaintiff’s property. There was judgment in the district court rejecting plaintiff’s demands, and he appealed.
 

 The plaintiff’s residence is a two-story frame building with concrete foundation, plastered walls, and tile roof. He testified that on December 28, 1928, in the morning, between 8 and 9 -o’clock, he was in his residence and heard a noise which sounded like a blast or rumbling, and “felt his house weave on its foundation apparently in a very violent manner,” which caused the plastering to be “more or less cracked in every room and closet in the entire house, moldings, paneling are out of joint, chimneys cracked, tile roof broken in possibly a hundred places. The house is generally in a
 
 *46
 
 very bad state of repairs, as generally would follow a heavy shot or an earth-quake.”
 

 He further testified that the house was practically new, having been built in 1926, and that prior to the date on which it was shaken by this explosion it was in perfect condition, and that “there was not a defect in it.”
 

 There is no positive testimony that the house was in perfect condition prior to the date of the explosion except that of the plaintiff himself. Subsequently, however, several persons went into it, some upon the invitation of the plaintiff and others at the request of defendant, for the specific purpose of inspecting it, and each of these found the plaster cracked around the corners of the doors and windows and “in the angles,” meaning in the joints or corners where the walls joined together and where the walls joined the ceilings. They found a few other cracks in the walls and also some “hair cracks” on the smooth surfaces. One of the witnesses examined the tile roof and found it cracked and others found a crack in the chimney. It is defendant’s contention that this condition existed prior to the explosion.
 

 Plaintiff called a carpenter, Mr. McNichois, who-testified that on January 1, 1929, four days after the explosion, he went to the house at the request of the plaintiff, who showed him through the entire building, and that he found cracks in -all the walls, that he “noticed in one or two places where the wood-work seemed to have been separated; I mean the wood-work or the casings around the windows and doors.” He was asked by counsel for plaintiff, “Did you find any other portions of the building which in your opinion required repairs?” He answered, “No.” On cross-examination, he said he found nothing wrong with the floors, the mantels, the cabinets, the stairs, the baseboards, the crown moulds, or with the doors or windows. Similar testimony was given by all- the other witnesses. But 'they said that, if the house had to be replastered, all the interior woodwork would be damaged.
 

 Plaintiff also called Mr. McNaspy, who plastered the house -originally, and who examined it -about January 1 for the purpose of estimating the cost of replastering it. He testified that he found 'the plaster very badly 'cracked, “mostly in the ends, generally throughout the house,” but he could not recall how many damaged places there were, and a cross-examination disclosed that his recollection of the condition of the interior of the house was rather indistinct. He further testified that the plaster was put on wood laths with no metal angle strips or other reinforcements at the corners. He said that ordinarily plaster put on wood laths, as this was, without metal angle strips, cracks at the corners due to shrinkage and settlement of the house. On being asked about the nature of the cracks and where they were, he said, “In the angles,” and again, “I don’t remember that each and every wall was cracked; I don’t remember any particular cracks in any particular room. I remember -the genera-l appearance of' the building.”
 

 Mr. Cheron, a plasterer, also called by plaintiff, found shrinkage and settlement cracks, “not a great many and not a very' few,” most of them in the angles. He said he found more than he thought there should be from natural causes.
 

 Defendant called several witnesses who examined the house; among them being Mr. McOlane, a building contractor, Mr. Hump-re ville, a plastering contractor, and Mr. Cole
 
 *48
 
 man. a civil engineer. These witnesses examined the house and stated that the plaster was cracked at the corners and a few other places, but said that the cracks were due to natural causes such as shrinkage of the lumber and settlement of the house. One of them stated that some of the cracks were old, as evidenced by the accumulation of dust, soot, and fuzz in them. These were men of wide experiences continuing over a long period of years. They each stated that they had observed cracks in plastered walls caused by the shaking or jarring of a building by explosions of this kind, as well as those caused by shrinkage of the lumber or settling of the house, and that thepe is a difference which they described in detail. They gave it as their unqualified opinion that the cracks which they found in the plaintiff’s house were caused, not by the explosion, but by shrinkage and settlement.
 

 Mr. H. O. Duncan, an architect of Alexandria, who was called by plaintiff, stated that he found a few horizontal cracks and some perpendicular ones in the corners and a few where the walls joined, the ceilings. Asked how many, he said, “I should judge they would probably average about one crack to the room,” explaining that he meant one of the angles of the rooms. Asked where the other cracks were, he said, “The cracks were in the walls and ceilings adjacent to the openings and in some places in the blank wall spaces.” He further stated that shrinkage of the lumber and natural settlement of the building would cause such cracks.
 

 Plaintiff’s house was built approximately two years prior to the explosion, but the plastering job was not first class. The contractor who did the work said it was, but on that point he was contradicted by every other witness who took the stand.. Some of them rated it as second and others as third class; one of them stating that it was a “fair average job.” Contractors called by both plaintiff and defendant, as well as Mr. Coleman, a supervising engineer and Mr. Duncan, stated that, where plaster is put on wood laths, it is necessary, in order to avoid cracks around the doors and windows and in the corners, to reinforce
 
 it
 
 with metal angle strips, which was not done in this case. There was further testimony that in this climate, especially where plaster is put on wood laths without reinforcement in a frame building, cracks such as were found in plaintiff’s building invariably appear within two years. Plaintiff testified that there was not a defect in his plastering prior to this explosion. His testimony to that effect is not corroborated, although it was admitted that his wife, if called, would testify substantially as he did. The fact, however, that the contractors, even those called by him, and the engineer and the architect, all testified that plastering under such conditions does invariably crack, lends strong support to the suggestion that plaintiff and his wife had probably paid no particular attention to the condition of their house pri- or to the explosion. This theory finds further support in the fact that, while plaintiff testified that the explosion caused the chimney to “crack from bottom to fop,” yet he admitted that he had not looked to see if it was cracked before.
 

 From the testimony as a whole we are not impressed that there are many serious defects in the plastering, and are decidedly of the opinion that there are none which might not be expected under ordinary conditions.
 

 With reference to the condition of the roof, Mr. Coleman, a supervising engineer
 
 *50
 
 from New Orleans, went into the attic and found that the roof had sagged due to the fact that the rafters, which were not properly supported by braces, were not strong enough to support the heavy tile roof, and that the sagging caused the tiling to crack and become displaced.
 

 The testimony amply shows that the explosion produced earth tremors sufficient to cause disturbance to buildings in the vicinity of plaintiff’s, and we have no doubt that his was shaken to some extent. But as a condition precedent to recovery it was incumbent upon plaintiff to show with some degree of certainty that the present defects in his building were caused by the explosion. This he failed to do, and his demands were therefore properly rejected.
 

 For the -reasons assigned, the judgment appealed from is affirmed, with all costs.