## LE BLEU v. SHELL PETROLEUM CORPORATION.[*]
### No. 1472.

Court of Appeal of Louisiana. First Circuit.

May 14, 1935.

George C. Schoenberger, Jr., of Houston, Tex., for appellant.

M. R. Stewart, of Lake Charles, for appellee.

LE BLANC, Judge.

The defendant appeals from a judgment in the lower court which condemned it to pay the plaintiff $900 for damages to his house alleged to have been caused by its negligence in exploding a charge of dynamite on his premises while making geophysical investigations and exploring the neighboring country for mineral indications by means of the seismograph. The demand was for $1,000, and plaintiff has answered the appeal asking for an increase in the award to that sum.

Plaintiff's house is situated in the country in or near the settlement in Calcasieu parish known as Chloe. On June 6, 1934, the defendant company obtained a permit from him to go upon his land to shoot charges of dynamite in conducting their explorations. The agreement between them was that defendant would pay plaintiff $5 for each shot or blast and, in addition, pay for any damages to the improvements on his premises. Under this agreement, defendant set off one discharge on June 7, and one on June 8, 1934, from the effects of which plaintiff claims that the earth trembled so that his dwelling house was greatly shaken and weakened in all its five apartments, that it swagged and leaned four inches out of line to the west, that the chimney cracked, the foundation was displaced, the gables caved in, and in fact that it was damaged beyond repair.

Plaintiff's cause of action grows out of article 2315 of the Civil Code, and in order to recover he must be able to show that he has suffered damage as alleged by him and that the damage was caused through the fault or negligence of the defendant. McIlhenny v. Roxana Petroleum Corporation, 10 La. App. 692, 122 So. 165. The defendant not only contends that plaintiff has not shown fault or negligence on its part, but that the testimony shows on the contrary that the damage to his house, instead of having been caused by any vibrations of earth following the dynamite explosions, was due to poor workmanship in its construction; that the piers on which it rested were improperly placed on or in the ground, and when they settled they became uneven causing the whole building to be thrown out of line.

Plaintiff's house was originally a box house erected on a lot approximately a mile and a quarter from the site on which it is presently located. That box house was built in 1910. The year in which it was moved to its present location is not shown. It is known, however, that even after its removal, it rested on wooden piers. In 1920, plaintiff undertook rather extensive repairs and added new rooms to the original structure. The piers for the new rooms were brick and those under the old portion of the house changed from wood to brick. In changing these last piers, however, the house was not jacked up and then let down on the new piers. The piers were built up under the house to reach the sills which rested on them. There were thirty-six piers in all, some with their foundations built in the ground, and others whose foundations rested on the surface.

The explosions of dynamite, which plaintiff complains of as causing the damage to his house, consisted of 300 pounds of 100 per cent. blasting gelatin, each, placed in holes 65 feet below the surface of the earth, drilled especially for that purpose. These holes were 4½ inches in diameter each, the one in

*Rehearing denied June 14, 1935. Writ of error refused July 12, 1935.

which the first discharge took place being at a distance of 752 feet from the plaintiff's house and the second about 175 feet further than the first.

The plaintiff introduced his own testimony, that of his wife, of a relative, Mrs. Mitchell Le Bleu, and also that of two of their friends, Mr. and Mrs. R. J. Boudreaux, to show the difference in the condition of the house after the discharge of the first blast by defendant on June 7, 1934. Whilst they differ in some details and some of them tell of changes in condition that it is very difficult indeed to believe could have taken place, they all in effect state that as they knew the house before, it was absolutely strong and solid, level on its piers, the floors did not shake, the doors and windows swung open and could be raised and lowered easily; whereas after the date of the blast, defects of this nature were readily perceptible. As an example of some parts of that testimony which we think is, to say the least, a bit exaggerated, we might refer to that of some of these ladies who stated that the roof did not leak before; whereas after the explosion, there were leaks in the house. Mrs. Le Bleu, plaintiff's wife, goes even further in her testimony and says that the vibrations from the blast caused some shingles to shake from the roof. The testimony regarding the roof, on the contrary, is positive that it was in a very poor condition before, the photographs offered in evidence affording further proof of that fact, and some of plaintiff's own witnesses admit that it leaked. The plaintiff's own testimony, of course, is the strongest of all with regard to the almost total wreckage of his house by the blast. He says that every door and every window in the house is now "somewhat off"; that 23 out of the 36 piers under the house "were all shot up"; and that you can stand on the floor now "and shake the furniture down, or they all vibrate." The chimney, he says, is broken in two places and that the west gable is about 4 inches out of place. All of this he attributes to the blast of dynamite. When asked to state what he observed when the explosion took place, he says: "I was sitting in the room and the first thing I saw in the corner of the room and the whole house vibrated, from six inches to a foot."

It might be noted at this time that although in his petition plaintiff alleges that the damage was caused from both explosions, most of his testimony relates to the first only. On the day of the second blast, he was not in the house but sitting under a tree in his yard. He speaks of its effects in a general way only and does not refer to any specific damage such as was caused by the first explosion.

Plaintiff offered the testimony of Mr. Adolph A. See, a gentleman who had some experience in blasting with dynamite in a salt mine, and who states it as his opinion that nothing less could have shaken plaintiff's house but a large blast of dynamite "somewhere near around." We doubt very much that Mr. See intended to speak with the authority of an expert on the effect produced by the blasting of dynamite such as it is conducted by the defendant in this case. His experience in the salt mine was not the same as that of a person engaged in the work being done by the defendant, and he himself frankly admits that he never had made a study of the effect of vibration that was caused even by a mine blast.

The defendant produced three expert witnesses who testified on the subject of high explosives and their effects when discharged in causing the earth to vibrate: One, Mr. George Carr, its employee who directed the work on the occasion when the damage to plaintiff's house is alleged to have occurred; another, Mr. Lamar C. Le Bron of the Hercules Powder Company, with over seven years' experience in different departments, some of it as supervising and conducting blasting work in the manufacture of various types of high explosives and electric designators; and Mr. I. M. Griffin, Jr., salesman and service manager of the Illinois Powder Manufacturing Company and who also at one time did seismograph work for the defendant. All three give it as their expert opinion that the shot discharged by the defendant on the plaintiff's premises, "barricaded," as they express it, in a hole four and one-half inches in diameter, 65 feet below the surface of the earth, could not possibly have produced a vibration sufficient to cause the damage which the plaintiff complains of. By referring to the American Table of Distances, recognized as the standard among manufacturers of high explosives, Mr. Carr showed where it was safe to discharge a blast of 300 pounds of dynamite, without barricade, at a distance of 640 feet from the nearest building. He states that a shot of the magnitude of the one used in this case, in the manner that it was, would cause an amplitude of movement of the earth of probably eighteen or twenty ten thousandths of an inch, at a distance of 752 feet. He says that the vibration would be less than that

caused by a railroad train passing 50 feet away from a house. The testimony of Mr. Le Bron and of Mr. Griffin is to the same effect as that of Mr. Carr. There may be some slight variation in the statement of the one or the other about the amplitude of vibration caused by the shot in question, but when we consider that we are dealing with the ten thousandth part of an inch, what difference there may be is hardly appreciable.

It is simply impossible to reconcile this testimony with that of the plaintiff and his witnesses, which would lead to but one conclusion, and that is the present condition of his house did not exist at all before and only came into existence because of the dynamite blast of June 7, 1934. And still we cannot ignore the testimony of these experts. It is not controverted in any way. Given any consideration whatever, it necessarily casts a serious doubt around the testimony produced by the plaintiff, and also as to the real cause of the present condition of his house as described by him.

But we find that the plaintiff's side of the case is further weakened when we come to consider another line of testimony, and that is with regard to the construction of his house. On this point we find that we have the testimony of several carpenters and contractors, three of whom were placed on the stand by the plaintiff and three by the defendant. The substance of the defendant's witnesses on this point is that the house was poorly constructed, that the piers on which it rested were uneven, some of them not properly laid in the ground as they should have been to secure a good and solid foundation, and that in settling, this caused the whole building to be out of level. Some of them speak of one of the corners having been built out of plumb and that while some of the casings are plumb, others are not. Not one of these witnesses saw anything in its condition when they examined it, to indicate that it had been subjected to any recent violent shaking. Their opinion, as a whole, was that its condition was due to gradual deterioration, an uneven settlement from defective piers, and poor workmanship in its original construction. In connection with this point, it is rather significant to note that two of the plaintiff's own witnesses were rather evasive in testifying as to the class of workmanship they found in the house. Mr. Corbello, one of them, admits that in speaking to Mr. Olivier, one of defendant's witnesses, he told him that its present condition was due in part to poor construction and old age. When asked further if he did not tell Mr. Olivier that the condition was not caused by a shot of dynamite, he says that he does not remember. The other of these two witnesses, Mr. George Scallian, was asked his opinion on cross-examination about the house generally as to workmanship and proper construction, and he answered: "That is hard to say. I have seen houses that was very well constructed and some that was very roughly constructed," and when pressed by the following question to state his opinion as to this particular house, says: "It seems to be constructed solidly in a way, but it is not workman-like. It is not a finished job." This, coming from two of plaintiff's own witnesses, gives greater weight to the testimony of the defendant's witnesses on this point and leaves the question as to the real cause of the present condition of the house in still greater uncertainty.

It was incumbent on the plaintiff to show, to a legal certainty, that the damaged condition he claims his house to be in was caused by the fault or through the negligence of the defendant in improperly discharging these blasts of dynamite on his premises, either by shooting them in too close proximity to his house, or in having exploded too large a blast, or in some other way not in accord with the usual and accepted methods in conducting such operations as they were engaged in on his premises. To make it appear that the damage he claims was only a probable result of any fault or negligence on its part is not sufficient. There is a good bit of similarity between the facts in this case and those as appear from a reading of the opinion, in the case of Thistlethwaite v. Shell Petroleum Corporation, 172 La. 43, 133 So. 356, wherein a demand, similar to the one here, was rejected for the failure of the plaintiff to have shown with some degree of certainty that the defects in his building were caused by the explosion complained of. True, the demand had been rejected in the lower court, whereas in the present case, plaintiff comes before us with a judgment in his favor. With all due respect, we nevertheless find ourselves unable to agree with the learned district judge and must necessarily reverse the judgment.

For the reasons herein stated, it is therefore ordered, adjudged, and decreed that the judgment appealed from be and the same is hereby reversed, annulled, and set aside, and it is now ordered that there be judgment in favor of the defendant and against the plaintiff rejecting the latter's demand and dismissing his suit at his costs.